| | |
|---|---|
| **1st Judicial District Court**<br>**Jefferson County, State of Colorado**<br>Court Address:   100 Jefferson County Pkwy.<br>                                 Golden, CO 80419 | DATE FILED: June 21, 2018 3:05 PM<br>FILING ID: E2CE0FCF48A6A<br>CASE NUMBER: 2018CV31012 |
| **Plaintiffs:**   Brett Blazek and Tarah Blazek<br><br>**v.**<br><br>**Defendant:**   Safeco Insurance Company of America | ▲   COURT USE ONLY   ▲ |
| **Attorneys for Plaintiffs:**<br>Attorney:   David Roth, #44800<br>                    Samuel F. Mitchell, #51253<br>Address:    Speights and Worrich, LLC<br>                    2149 S. Holly Street, Suite 105<br>                    Denver, CO 80222<br>Phone Num.:   (303) 662-8082<br>Fax Num.:       (303) 662-8083<br>E-Mail:            david@speightsfirm.com<br>                        sam@speightsfirm.com | Case Number:<br><br>Div.: |
| **COMPLAINT AND JURY DEMAND** ||

COME NOW PLAINTIFFS, Brett Blazek and Tarah Blazek, by and through their attorneys, Speights and Worrich, LLC, and Complain against the above-named Defendant as follows:

### INTRODUCTION

1. Brett and Tarah Blazek had just returned home from a family vacation with their young five (5) year old daughter on the night of August 3, 2017, to realize that their home and personal belongings had been damaged from a water leak within their home.

2. While this tragedy alone would have been difficult to cope with and recover from, the months and conversations that followed between the Brett and Tarah Blazek and their insurance company, Safeco Insurance Company of America, made the situation a nightmare.

Exhibit A

3. From there being at least six adjusters on the claim, to the acknowledgement of delay by Safeco Insurance Company of America and then still failing to act, Brett and Tarah Blazek were forced to live in hotels, apartments, with friends, and explain to their young daughter why she could not go home and play in her room.

4. Safeco Insurance Company of America promises on their website that, "[w]hen you have a claim, we take care of it. It's that simple." Clearly, it is not, and as a result of the neglect and delay exemplified by Safeco Insurance Company of America throughout the handling of the Brett and Tarah Blazek's claim, Brett and Tarah Blazek now bring this litigation to redress the conduct of Safeco Insurance Company of America during their claim.

## PARTIES, JURISDICTION, AND VENUE

5. Plaintiff Brett Blazek is a citizen and domicile of Jefferson County in the State of Colorado.

6. Plaintiff Tarah Blazek is a citizen and domicile of Jefferson County in the State of Colorado.

7. Upon information and belief, Defendant, Safeco Insurance Company of America is a foreign corporation organized under the laws of New Hampshire, with its principal place of business located at 62 Maple Avenue, Keene, New Hampshire 03820, and is authorized to do business in Colorado.

8. This Court has jurisdiction over the subject matter of this action and parties hereto.

9. Venue is proper in this Court pursuant to C.R.C.P. 98(c)(1).

## GENERAL ALLEGATIONS

10. Safeco Insurance Company of America (hereinafter "Defendant") issued Policy Number OX6009790 (hereinafter the "Policy") to Brett Blazek and Tarah Blazek (hereinafter

"Plaintiffs") insuring their home located at 8533 South Flower Court, Littleton, CO 80128 (hereinafter the "Property") on the date of the leak.

11. The Policy covers, *inter alia*, all risks of direct physical loss or damage to the home located at the Property, including property damaged by water.

12. On or about August 3, 2017, Plaintiffs' home was damaged due to a leak within the home.

13. Plaintiffs filed a claim for benefits August 3, 2017, upon observing the damage with Defendant and Defendant issued claim number 035965063-01.

14. Defendant sent Rainbow International to inspect the damage to the Property. Brett with Rainbow International subsequently inspected and deemed the damage to be a level III, the highest level of damage.

15. Defendant's initial adjuster Bill Fraser, called Plaintiffs the next day August 4, 2017, and indicated that Defendant would not be extending Additional Living Expenses ("ALE") as afforded by the Policy as "the house is not uninhabitable, it will just be uncomfortable, and that Plaintiffs were going to have to agree to disagree on the topic."

16. This conversation was followed by an equally unpleasant encounter with Defendant's field adjuster. Plaintiffs informed said adjuster, with evidence, that there was no hot water in the home and that the ambient temperature registered 90 degrees Fahrenheit within the home. Defendant's field adjuster responded to Plaintiffs' evidence and request for ALE with the same response, "the home isn't uninhabitable, it's just going to be uncomfortable."

17. On August 8, 2017, Plaintiffs hired Tom Andrews of Pearl Restoration to be Plaintiffs' General Contractor.

18. For reasons unknown to Plaintiffs, after speaking with Plaintiffs General Contractor, Defendant's adjuster had a change of heart. Defendant's adjuster stated that "after speaking

with Tom, the situation was actually far worse than was previously thought and that ALE would in fact be needed."

19. Defendant subsequently placed Plaintiffs in the Homewood Suites.

20. On August 9, 2017, Plaintiffs General Contractor wrote an estimate of the repairs necessary to make Plaintiffs and their home whole to total $76,946.16 actual cash value ("ACV").

21. On August 13, 2017, Defendant wrote an estimate for the catastrophic loss sustained by Plaintiffs' home with a replacement cost value ("RCV") of $33,651.93 and an ACV of $23,742.77.

22. Despite the apparent discrepancy in the valuation difference between Plaintiffs' and Defendant's estimates, what was agreed was Plaintiffs' home sustained significant damage and work needed to begin immediately to prevent against further loss and damage to the home.

23. On August 17, 2017 Plaintiffs moved for the third time in two weeks into the Vistas at Stony Creek Apartments ("Vistas").

24. On September 6, 2017, a letter was clipped by the Vistas property management to the door of Plaintiffs' temporary apartment indicating that there was an outstanding balance of $14.52 as a consequence of Plaintiffs not carrying renter's insurance. The property manager understood why Plaintiffs were not providing such a policy but advised Plaintiffs to pay the balance so as to not incur late fees and to take the matter up with Defendant. Defendant did not confirm this information for nineteen days.

25. On September 11, 2017, Defendant's adjuster called Plaintiffs and left a voicemail wherein he indicated that, he had been in contact with Plaintiffs General Contractor regarding the disparity between Plaintiffs' and Defendant's estimates but advised that "we will reconcile

those differences" and there was no need for a call back. Defendant's adjuster also stated that he was being taken off Plaintiffs Claim and that a new adjuster was to be assigned and that the "transition would be seamless."

26. The transition was anything but seamless. Four days later, a new adjuster had yet to be assigned to Plaintiffs' Claim, and as such, Plaintiffs called Defendant and requested an adjuster be assigned. The assignment did not occur until September 19, 2017, and Plaintiffs were not notified by Defendant of the assignment of Alex Hall but rather had to call Defendant and inquire.

27. Plaintiffs were seeking an extension to their ALE benefits as difficulties in the restoration arose and without advisement and approval from Defendant, Plaintiffs were placed in an ever increasingly difficult position.

28. Ms. Hall was not only difficult for Plaintiffs to get in contact with but also Plaintiffs General Contractor called and attempted to contact Ms. Hall regarding electrical upgrades and other matters that needed her approval prior to the work being performed. This lack of communication by Defendant added to the delay of Plaintiffs' Claim.

29. Plaintiffs themselves had sent approximately four emails and left numerous voicemails with Ms. Hall and Defendant during the period of Ms. Hall's initial assignment. The first time she made contact was on October 5, 2017. The substance of such contact was nothing substantive but a terse response stating, "I want to apologize for my delayed response…I can give you or your wife a call today."

30. Plaintiffs immediately responded to this email from Defendant and provided a timeframe when they would be available for a conversation. Ms. Hall did not follow through on her assurance and, as a result, Plaintiffs were forced to wait another day.

31. When the conversation finally took place, Ms. Hall was unable to place Plaintiffs' minds at ease and instead followed the Safeco Mantra, "[w]hen you have a claim, we take care of it. It's that simple." The answers provided to Plaintiffs' questions were broad and cursory and did not address the substantive issues of how to resolve estimate differences (which was causing Plaintiffs bank, Wells Fargo, to withhold funds) nor the issues pertaining to ALE.

32. Such answers were not provided until October 11, 2017, when relevant portion of Defendant's email to Plaintiffs state:

    a. I want to ensure you from this point on;
    b. I apologize for my lack of communication and I will do my best to communicate with you as promptly as possible.;
    c. I have sent your claim to be assigned for re-inspection.

33. While Defendant did set-up a re-inspection of Plaintiffs' home, Ms. Hall's other assurances were false promises. Plaintiffs were soon to be asked to leave their temporary apartment for failure to renew ALE correctly, personal property concerns were raised, and six emails were sent to Ms. Hall with ever increasing urgency as Plaintiffs did not want to tell their five-year old daughter they did not know where they are going to sleep at night.

34. Ms. Hall finally responded October 25, 2017, not to "take care of it" as Defendant assures their insureds they will do but to rather inform Plaintiffs that she was set to be taken off the matter and a new adjuster was to be assigned.

35. A re-inspection estimate of Plaintiffs' home was provided on October 26, 2017, with an RCV of $64,460.95 and an ACV of $49,818.82.

36. The next morning, Plaintiffs emailed the field adjuster who performed the re-inspection of Plaintiffs' home seeking conferral and a working relationship so that Defendant and

Plaintiffs could arrive at an amenable agreement as to the cost necessary to repair Plaintiffs' home. Such an agreement was made.

37. On November 1, 2017 Plaintiffs filed a complaint with Department of Regulatory Agencies ("DORA") wherein Plaintiffs asserted the same allegations as set forth in this Complaint; Defendant's failure to communicate, failure to adequate address and answer questions regarding the claim, failure and delay to come to an agreement on scope of work, and failure to treat its insureds in a good faith manner.

38. Plaintiffs were not informed by Defendant's field adjuster, nor by Defendant's new claim adjuster but rather through the ALE services department that Dorarene Williams was now assigned to the Claim. This occurred eight days after Ms. Hall indicated she would no longer be handling Plaintiffs' Claim.

39. Plaintiffs obtained and emailed Ms. Williams on November 3, 2017, a list of updates and matters that needed to be addressed. Ms. Williams provided some answers and informed Plaintiffs that she would be approving a POD trash disposal unit. This was the first acknowledgment and acceptance of responsibility for the POD by Defendant. A similar request was made on October 17, 2017, and while this was acknowledged on November 3, 2017, Defendant did not follow through on its assurance to provide the POD until December 13, 2017.

40. A Personal Property claims adjuster, Jerrick, was assigned to Plaintiffs' Claim to prepare an estimate for contents and collectible sports memorabilia. While patently, said adjuster appeared jovial and concerned regarding the handling of Plaintiffs' Claim, Defendant's estimate was unacceptably low, omitting damaged items, and accounted for greater than allowable depreciation.

41. Ms. Williams next reached out via email November 30, 2017, indicating that she was in the process of reviewing a third-party contractor estimate of Plaintiffs' home.

42. On December 4, 2017, Plaintiffs received an email from *The Innovation Property TEAM* wherein it is notated that, "[y]our adjustor at Liberty Mutual, Dorarene, asked us to get in touch with you to see if you needed assistance in finding a contractor to handle your repairs." Upon information and belief, this suggestion was made by Defendant as a result of failure to properly review and handle Plaintiffs' claim by Dorarene as all prior claims adjusters were aware of the fact and accepted Pearl Restorations and Tom Andrews to be acting as the General Contractor on Plaintiffs' behalf.

43. On December 11, 2017, a new adjuster for Defendant named Pablo became involved in Plaintiffs' Claim. Pablo informed Plaintiffs' General Contractor that in his fifteen (15) years in the business of being an insurance adjuster he "has never seen a claim this messed up" and the manner and fashion upon which Defendant has been handling the claim since day one had been "completely wrong."

44. Over a month after Dorarene's last contact, on December 12, 2017, Defendant made contact and provided no insight or guidance. As such, Plaintiffs sent numerous emails to Defendant requesting clarification and on December 18, 2017, Plaintiffs were informed via an automated response that Dorarene would be out of the office until January 2, 2018, further compounding the issues.

45. Plaintiffs as a result of delay and lack of communication were forced to pick up and move once again to the TownePlace Suites Denver Southwest on December 28, 2017. Plaintiffs experience while in this lodging was horrific. Mr. Blazek's registration tags were cut and stolen off his vehicle while in the TownePlace parking lot, Plaintiffs' five-year-old

daughter had her tooth fairy money stolen from a drawer within the room, and Mrs. Blazek had numerous pieces of jewelry and clothing stolen. None of this would have occurred but for Defendant's delay and mishandling of Plaintiffs' Claim.

46. As such, Plaintiffs requested an immediate change of lodging while their home was being repaired. Subsequent to this request, ALE complied, and Plaintiffs moved yet again to the Homewood Suites Denver-Littleton on January 10, 2018.

47. On or about January 18, 2018, an agreed upon price for the cost of repairs to Plaintiffs' home was reached between Plaintiffs' General Contractor and Defendant for an RCV total of $79,868.16, approximately $3,000.00 more than Plaintiffs' General Contractor estimate, which was provided to Defendant back in August 2017.

48. Ms. Williams further delayed and provided non-responses to important and urgent matters regarding Plaintiffs' Claim and rather than hold true to her assurances when initially taking over the claim that she would "be the last adjuster" on the file, her assurances were false and on February 13, 2018 Defendant handed the file off to adjuster Jazmine Jackson.

49. Ms. Jackson acknowledged the frustration of Plaintiffs as a result of improper claims handling by Defendant, and assured Plaintiffs that "I have a duty to now turn your entire claims experience around…and that is what I intend to do."

50. On February 19, 2018, Plaintiffs were able to move back into their home and regain some semblance of dignity and closure. As such, they will no longer be forced to spend birthdays, Thanksgiving, and Christmas in a hotel, nor be subjected to the prying eyes and theft associated with living in a hotel, nor will Plaintiffs have to explain to their daughter why people steal or why she could not go home.

51. While moving home was supposed to be a good thing, Defendant, in its handling of Plaintiffs' Claim, regressed into its "status quo" of delay and over depreciating Plaintiffs Personal Property Claims. As such, Plaintiffs bring this action and request redress on the below referenced causes-of-action and any and all other remedies this Court deem just and appropriate.

### FIRST CAUSE OF ACTION
### (Breach of Contract)

52. Plaintiffs incorporate paragraphs 1 through 51 of their Complaint as if fully set forth herein.

53. The Policy creates a contract of insurance.

54. By its actions, as described above, Defendant breached the contract of insurance.

55. The estimates provided and outlined by Defendant regarding Personal Property and the same did not compensate Plaintiffs in accordance with the insurance policy to make Plaintiffs whole and restore them to pre-flood condition.

56. As a direct and proximate result of said breach, the Plaintiffs are entitled to damages in an amount to be determined at trial.

### SECOND CLAIM FOR RELIEF
### (Bad Faith Breach of Insurance Contract)

57. Plaintiffs incorporate paragraphs 1 through 56 of their Complaint as if fully set forth herein.

58. Defendant owed duties to Plaintiffs under the Policy's implied covenant of good faith and fair dealing, wherein it covenanted that it would, in good faith, and in the exercise of fair dealing, deal with Plaintiffs fairly and honestly, faithfully perform its duties of representation, and do nothing to impair, interfere with, hinder, or potentially injure Plaintiffs' rights to receive the Policy's benefits.

59. Defendant acted unreasonably and breached its duties of good faith and fair dealing by its actions, which included, without limitation, the following unreasonable acts:

    a. Misrepresenting Policy provisions to their insureds.

    b. Failing to properly investigate and evaluate Plaintiffs' claims for Policy benefits;

    c. Failing to pay Plaintiffs the full benefits owed under the Policy;

    d. Failing to pay amounts under the Policy in a timely manner;

    e. Failing to effectuate a prompt, fair, and equitable settlement of Plaintiffs' claims;

    f. Failure to give equal consideration to Plaintiffs' rights and interests as it has given its own interests;

    g. Depriving Plaintiffs of the benefits and protections of the contract of insurance;

    h. Compelling Plaintiffs to institute litigation in order to recover amounts due under the Policy; and

    i. Other conduct to be revealed through discovery.

### THIRD CLAIM FOR RELIEF
**(Violation of C.R.S. §10-3-1115 and Relief Pursuant to §10-3-1116)**

60. Plaintiffs incorporate paragraphs 1 through 60 of their Complaint as if fully set forth herein.

61. C.R.S. §10-3-1115 forbids an insurer from unreasonably delaying or denying payment of a claim for benefits owed to or on behalf of a first-party claimant.

62. Plaintiffs are first-party claimants under C.R.S. §10-3-1115.

63. Defendant delayed and continues to delay resolution of Plaintiffs' claim without a reasonable basis within the meaning of C.R.S. §10-3-1115.

64. Numerous adjusters involved in the handling of Plaintiffs' Claim acknowledge the delay associated with the Claim.

65. All adjusters in the handling of Plaintiffs' Claim did not have a reasonable basis for the lack of communication nor delay in paying of benefits associated with Plaintiffs' Claim.

66. C.R.S. §10-3-1116 provides that a first-party claimant whose claim has been unreasonably delayed or denied by an insurer may bring an action in Colorado District Court to recover reasonable attorneys' fees and court costs and two times the covered benefit.

67. Because Defendant's actions, as described above, violate C.R.S. §10-3-1115, Plaintiffs bring this claim to recover their reasonable attorneys' fees and court costs and two times the covered benefit, as allowed under C.R.S. §10-3-1116.

WHEREFORE, Plaintiffs Brett Blazek and Tarah Blazek respectfully request that judgment be entered in their favor and against Defendant Safeco Insurance Company of America as follows:

    a. For compensatory damages, both economic and non-economic, in amounts to be proved at trial;

    b. For double damages pursuant to statute;

    c. For all prejudgment interest, statutory or moratory, and post-judgment interest allowed by law;

    d. For reasonable attorneys' fees and costs of suit herein; and

    e. For such other and further relief as this Court deems just and proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury.

Dated this 21st day of June, 2018.

Respectfully Submitted,

*/s/ David Roth*
David Roth, #44800
Samuel F. Mitchell, #51253

ATTORNEYS FOR PLAINTIFFS

*In accordance with C.R.C.P. 121 § 1-26(9), a printable copy of this document with electronic signatures is being maintained at the office of the filing party's counsel and is available for inspection by other parties or the court upon request.*